947 F.2d 11
 PROJECT B.A.S.I.C., Plaintiff, Appellee,
v.
Jack KEMP, Secretary of Housing and Urban Development, et
al., Defendants.
PHOENIX-GRIFFIN GROUP II, LTD., et al., Plaintiff, Appellee,
v.
Jack KEMP, Secretary of Housing and Urban Development, et
al., Defendants.
Jack Kemp, Secretary of Housing and Urban Development, and
United States Department of Housing and Urban
Development, Defendants, Appellants.
 No. 91-1612.
 United States Court of Appeals,
First Circuit.
 Heard July 30, 1991.
Decided Oct. 17, 1991.
 
 John F. Daly, Atty., Appellate Staff, Civil Div., U.S. Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., Michael Jay Singer, Atty., Appellate Staff, Lincoln C. Almond, U.S. Atty., John W. Herold, Associate Gen. Counsel (HUD), Howard M. Schmeltzer, Asst. Gen. Counsel (HUD), and Richard M. Price, Trial Atty. (HUD), Washington, D.C., were on brief, for defendants, appellants.
 Robert B. Mann, with whom Mann & Mitchell, Providence, R.I., was on brief, for plaintiffs, appellees Phoenix-Griffin Group II, Ltd., et al.
 Steven Fischbach, with whom Judith Kay and Rhode Island Legal Services, Providence, R.I., were on brief, for plaintiff, appellee Project B.A.S.I.C.
 Before TORRUELLA and SELYA, Circuit Judges, and YOUNG,* District Judge.
 SELYA, Circuit Judge.
 
 
 1
 This is an appeal from a court order holding the Secretary of Housing and Urban Development (HUD) in civil contempt and imposing monetary sanctions.[1] We granted a stay and expedited appellate proceedings. We now reverse.
 
 I. BACKGROUND
 
 2
 We begin by tracing the contours of the two earlier proceedings which together gave rise to the present appeal.
 
 
 3
 A. The Original Litigation (PB-I and PB-II).
 
 
 4
 Simmering hostilities erupted into public view when Project B.A.S.I.C. (BASIC), a tenant-advocacy organization, asked the federal district court to enjoin the Providence Housing Authority (PHA) from tearing down certain portions of an antiquated public housing project known as Hartford Park, located in Providence, Rhode Island. The district court denied BASIC's motion for a preliminary injunction prohibiting the scheduled demolition. Project B.A.S.I.C. v. Kemp, 721 F.Supp. 1501, 1518 (D.R.I.1989) (PB-I ). We affirmed that denial without a published opinion. PHA proceeded to pulverize the structures.
 
 
 5
 There was more to PB-I, however, than the request for prohibitory injunctive relief. Thus, in addition to denying the prohibitory restrainer, the district court also entered the following decree:
 
 
 6
 IT IS HEREBY ORDERED that the PHA proceed as soon as possible to begin construction of the 240 public housing units, funded by HUD, needed to replace the 240 units lost due to the past and planned demolition of the highrises at Hartford Park. The PHA is ordered to complete construction of all 240 units of replacement housing within 23 months of the date of this Opinion [July 17, 1989].
 
 
 7
 PB-I, 721 F.Supp. at 1515. In a separate appeal, we ruled that the legal grounds adduced by the district court to justify this mandatory injunction (which we shall refer to as the 1989 Order) were inadequate to that end. Project B.A.S.I.C. v. O'Rourke, 907 F.2d 1242, 1243-47 (1st Cir.1990) (PB-II ). We noted, nonetheless, that the 1989 Order might be supportable on other grounds. Id. at 1247-49. For this reason, and mindful of the prospect that "the parties may ... no longer disagree about the order," id. at 1249, we did not vacate the 1989 Order but left it "in place provisionally," with directions to the district court to "reconsider the legal basis for its order if [the parties] request it to do so." Id.
 
 
 8
 On remand, no such request was made. Rather, the litigants' energies appear to have been expended principally on an amicable resolution of the underlying problems which had, in the first instance, fomented the law suit. In April 1991, with the district court's approval, the parties entered into a series of settlement stipulations and consent orders designed to resolve the main dispute over the construction of replacement public housing.
 
 
 9
 B. The Second Litigation (Phoenix-I).
 
 
 10
 Much of the replacement housing was being developed by Phoenix-Griffin Group II, Ltd. and built by its affiliate, LTG Construction Co., as the general contractor. Both Phoenix-Griffin and LTG are owned by Lloyd T. Griffin. All are plaintiffs in the second litigation and appellees here. We refer to them collectively as Phoenix and to the second litigation as Phoenix-I.
 
 
 11
 During the course of Phoenix's work, a substantial question arose as to whether Phoenix had paid the wage rates required by federal law. The United States Department of Labor (DOL) requested HUD to withhold $500,000 in funds pending resolution of the question. When HUD announced its intention to withhold--or to direct PHA to withhold--$500,000 from the next payment due Phoenix, Phoenix sued both HUD and PHA. It sought injunctive relief, damages, and other remedies, asserting that husbanding the funds was arbitrary and capricious, violated specific laws and regulations, abridged Phoenix's constitutional rights, and threatened Phoenix with irreparable harm. Among other things, Phoenix asserted that, without access to the $500,000, it would be prevented from paying down its revolving line of credit, thus causing its lead bank to close the spigot. Phoenix feared that it would be unable to complete construction in progress if further advances were denied.
 
 
 12
 A hearing on Phoenix's request for a preliminary injunction was held on June 6, 1991. The stated purpose of the hearing was to determine if HUD and/or PHA should be enjoined from withholding payments due to Phoenix under existing contracts. At the hearing, the district judge suggested that HUD, which had directed the holdback, might be in contempt of the 1989 Order. He asked HUD to brief the topic.
 
 
 13
 Four days after HUD's brief was served, the court filed a memorandum decision under a dual caption referring to both the new and old cases. Project B.A.S.I.C. v. Kemp, 768 F.Supp. 21 (D.R.I.1991).[2] The court stated that its "clear intention at the time of the [1989 Order] was to bind HUD as well as the PHA." The court remarked that HUD had been an active participant in the litigation leading up to, and following, entry of the 1989 Order, including the earlier appeal. Characterizing HUD's decision to withhold $500,000 as the product of an interagency turf battle between HUD and DOL--a characterization which HUD emphatically contests--the court ruled that HUD could, and should, have avoided flouting the 1989 Order by issuing a change order to make funds available to Phoenix, notwithstanding DOL's administrative directive. Hence, HUD could not assert that compliance with the 1989 Order was an impossibility.
 
 
 14
 In the end, the court found that HUD was fully subject to the 1989 Order and had violated it. The court concluded that, "[u]ntil such time as HUD has done everything within its power to move the [replacement housing] project toward completion" as per the preexisting time schedule, the court would not find HUD to have complied with the outstanding order. 768 F.Supp. at 25 (emphasis in the original). The court gave HUD three days within which to resume making payments in the ordinary course. If HUD failed to do so within the three-day period, thus purging itself of the contempt, then:
 
 
 15
 In order to coerce compliance with my order, I will initially fine the agency $250,000. I will continue to fine it at a rate of $2,000 a day until HUD removes all barriers to completion within its control. The fine will be capped at $500,000 and any monies collected by this Court shall be applied toward completion of the housing.
 
 
 16
 Id. at 25-26. Cognizant of the tightness of the schedule it had imposed, the district court stayed execution of its order for an additional ten days (until June 27, 1991). During that interval, this appeal was docketed. We granted an appellate stay maintaining the status quo.[3]
 
 II. ISSUES ON APPEAL
 
 17
 The government advances a host of reasons why the contempt finding cannot stand. It argues, inter alia, that the 1989 Order was rendered nugatory by the stipulations entered into among the parties in the spring of 1991, see supra p. 14; that the contractual claim underlying Phoenix's suit belonged in the Court of Claims, not the district court; that the district court erred in entering the contempt finding sua sponte; that the suggested change order vitiated applicable provisions of the Administrative Procedure Act; that the contempt citation intruded improperly into the law enforcement functions of the Executive Branch; that the district court's assessment of a monetary sanction against HUD transgressed principles of sovereign immunity; and that the sanction imposed was unlawful since it was compensatory rather than coercive. For our purposes, however, we need not go beyond the government's main line of attack: its insistence that the 1989 Order did not comprise a clear and unequivocal command binding HUD to the performance of the duties envisioned at a later date by the district court. Because this attack carries the day, we decline to pursue the appellant's other theories (and we express no opinion on any of them).[4]
 
 III. STANDARD OF REVIEW
 
 18
 We turn first to the standard of review. Normally, we review a trial court's factfinding in contempt proceedings for clear error. See, e.g., Langton v. Johnston, 928 F.2d 1206, 1218-19 (1st Cir.1991); Fortin v. Commissioner of Mass. Dep't of Pub. Welfare, 692 F.2d 790, 794 (1st Cir.1982). Mixed fact/law questions are, ordinarily, reviewed in the same way. Langton, 928 F.2d at 1219; Fortin, 692 F.2d at 794. Questions of law and mixed questions where the legal aspect predominates are afforded plenary review. See, e.g., Davies v. Grossmont Union High School Dist., 930 F.2d 1390, 1394 (9th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 2892, 115 L.Ed.2d 1057 (1991); In re Grand Jury Proceedings, 88-9 (MIA), 899 F.2d 1039, 1042 (11th Cir.1990). The trial court's ultimate finding on contempt is reviewed for abuse of discretion. See, e.g., Massachusetts Ass'n of Older Americans v. Commissioner of Pub. Welfare, 803 F.2d 35, 38-39 (1st Cir.1986); General Signal Corp. v. Donallco, Inc., 787 F.2d 1376, 1379 (9th Cir.1986); see also In re Grand Jury Subpoenas, 906 F.2d 1485, 1488 (10th Cir.1990) (recapitulating applicable standards of review).
 
 
 19
 We have stated that the abuse-of-discretion standard will "be administered flexibly, with due regard for the circumstances." Langton, 928 F.2d at 1220; see also Massachusetts Ass'n of Older Americans, 803 F.2d at 38-39; AMF, Inc. v. Jewett, 711 F.2d 1096, 1101 (1st Cir.1983). One circumstance which must invariably be considered is the nature of the underlying case, it being accepted that greater deference is owed to the trial court in public law litigation than in purely private litigation. See, e.g., Massachusetts Ass'n of Older Americans, 803 F.2d at 38. But the most important circumstance is often the overall nature of the finding from which the appeal has been taken. Even in a public law case, our review will proceed more searchingly when, as here, we are confronted with a finding of contempt than when we are called upon to consider a finding exonerating a putative contemnor from a charged contempt. The contempt power is, after all, one of the most potent weapons in the judicial armamentarium. See International Longshoremen's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n, 389 U.S. 64, 76, 88 S.Ct. 201, 208, 19 L.Ed.2d 236 (1967).
 
 
 20
 Recognizing the contempt power's virility and damage potential, courts have created a number of prudential principles designed to oversee its deployment. For one thing, in levying contempt sanctions, the court must exercise the least possible power suitable to achieve the end proposed. Spallone v. United States, 493 U.S. 265, 110 S.Ct. 625, 632, 635, 107 L.Ed.2d 644 (1990); Shillitani v. United States, 384 U.S. 364, 371, 86 S.Ct. 1531, 1536, 16 L.Ed.2d 622 (1966). Second, "a complainant must prove civil contempt by clear and convincing evidence." Langton, 928 F.2d at 1220. For another thing, civil contempt will lie only if the putative contemnor has violated an order that is clear and unambiguous. See Local 1291, 389 U.S. at 76, 88 S.Ct. at 208; NBA Properties, Inc. v. Gold, 895 F.2d 30, 32 (1st Cir.1990); Drywall Tapers and Painters of Greater N.Y., Local 1974 v. Local 530 of Operative Plasterers and Cement Masons Int'l Ass'n, 889 F.2d 389, 395 (2d Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 1478, 108 L.Ed.2d 615 (1990); Ferrell v. Pierce, 785 F.2d 1372, 1378 (7th Cir.1986); Inmates of the Allegheny County Jail v. Wecht, 754 F.2d 120, 129 (3d Cir.1985); Reed v. Cleveland Bd. of Educ., 607 F.2d 749, 752 (6th Cir.1979). Related to this last requirement is the principle that any ambiguities or uncertainties in such a court order must be read in a light favorable to the person charged with contempt. NBA Properties, 895 F.2d at 32.
 
 
 21
 These principles reflect judicial awareness of the "court's awesome civil and criminal contempt powers." Wecht, 754 F.2d at 129. In line with this awareness, and mindful that a party cannot be held in contempt unless its contumacity clearly and convincingly appears, we turn our attention to the contempt finding in the instant case.
 
 IV. ANALYSIS
 
 22
 We bifurcate our analysis, considering first whether, reading the 1989 Order objectively, HUD had fair notice that it was compelled, on penalty of contempt, to follow a particular course of conduct. Because we answer this inquiry in the negative, we proceed to consider whether the appellants, even though not directly constrained by the 1989 Order, were bound to implement it because of their relationship with PHA.
 
 
 23
 A. Forewarned Is Forearmed.
 
 
 24
 There are several legal principles that guide our efforts here. The most important of these, already adverted to, implicates the unflagging need for clarity. This principle was given its most authoritative and oft-repeated form by the Supreme Court a quarter-century ago:
 
 
 25
 The judicial contempt power is a potent weapon. When it is founded upon a decree too vague to be understood, it can be a deadly one. Congress responded to that danger by requiring that a federal court frame its orders so that those who must obey them will know what the court intends to require and what it means to forbid.... The most fundamental postulates of our legal order forbid the imposition of a penalty for disobeying a command that defies comprehension.
 
 
 26
 Local 1291, 389 U.S. at 76, 88 S.Ct. at 208.
 
 
 27
 This requirement of clarity derives from concepts of fairness and due process. And, because an order commanding a person to act or refrain from acting is inherently coercive, the requirement of clarity mirrors the requirement of the Civil Rules that "[e]very order granting an injunction ... shall be specific in terms; [and] shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained; ...." Fed.R.Civ.P. 65(d).
 
 
 28
 The consequences that attend the violation of a court order are potentially dire. It follows, then, that courts must
 
 
 29
 read court decrees to mean rather precisely what they say. Decrees must "be specific;" they must "describe in reasonable detail" just what "acts" they forbid. These specificity requirements are not "mere[ly] technical" but are "designed to prevent uncertainty and confusion ... and to avoid" basing a "contempt citation on a decree too vague to be understood." Also, we must read any "ambiguities" or "omissions" in such a court order as "redound[ing] to the benefit of the person charged with contempt."
 
 
 30
 NBA Properties, 895 F.2d at 32 (citations omitted). In short, the contempt power ought not to be deployed against a backdrop of uncertainty.
 
 
 31
 A corollary of the requirement that orders enforceable through the contempt power be clear and unambiguous is that those who would suffer penalties for disobedience must be aware not merely of an order's existence, but also of the fact that the order is directed at them. This tenet has not been stated frequently. Withal, the relative rarity of articulation testifies more to the sheer obviousness of the principle, cf., e.g., M. de Cervantes, Don Quixote de la Mancha, Pt. III, bk. 10 (1615) ("Forewarned, forearmed."), than to doubts about its legitimacy. We think it is beyond serious question that, as a necessary prelude to a finding of contempt, the putative contemnor should have reasonably definite advance notice that a court order applies to it. In Spallone, for instance, the Court overturned a finding that city councilmen were in contempt, noting that the relevant provisions of the underlying decree did not direct the councilmen to act; rather, those provisions "were directed only to the city." 110 S.Ct. at 633.
 
 
 32
 A court order, then, must not only be specific about what is to be done or avoided, but can only compel action from those who have adequate notice that they are within the order's ambit. For a party to be held in contempt, it must have violated a clear and unambiguous order that left no reasonable doubt as to what behavior was expected and who was expected to behave in the indicated fashion. "In determining specificity, the party enjoined must be able to ascertain from the four corners of the order precisely what acts are forbidden." Drywall Tapers, 889 F.2d at 395 (citation omitted); see also Reed, 607 F.2d at 752 ("The notice of a judicial order upon violation of which a contempt finding may properly be based is such notice as would clearly tell a reasonable person what he is required to do or abstain from doing.").
 
 
 33
 We believe that Spallone illustrates the point. Indeed, there was far more in the Spallone decree to inform the councilmen that they were being directed to act than there was in the 1989 Order to inform HUD of any constraint. Much of the Spallone decree was explicitly addressed to a group that surely included the councilmen (the Spallone decree "was directed not only to the city but to 'its officers, agents, employees, successors and all persons in active concert or participation with any of them....' " Spallone, 110 S.Ct. at 633 (quoting decree)), yet the Court held that the council members were not in contempt of the decree because, among other reasons, the parts of the decree that were violated were not directed at them. See id. at 632-33. In contrast, the 1989 Order was not explicitly aimed toward HUD. Rather, HUD was only mentioned parenthetically in what appears as an explanation of the funding source that PHA would tap. More was needed as a prelude to saddling HUD with the pains and penalties of contempt. See, e.g., In re Baum, 606 F.2d 592, 593 (5th Cir.1979) (reversing finding of contempt because, inter alia, the order in question "was not addressed specifically" to the putative contemnor); Berry v. Midtown Serv. Corp., 104 F.2d 107, 111 (2d Cir.) ("Before a person should be subject to punishment for violating a command of the court, the order should inform him in definite terms as to the duties thereby imposed upon him."), cert. granted, 308 U.S. 536, 60 S.Ct. 114, 84 L.Ed. 452, cert. dismissed, 308 U.S. 629, 60 S.Ct. 297, 84 L.Ed. 525 (1939).
 
 
 34
 To be sure, the Secretary participated in an appeal of the 1989 Order, which arouses some suspicion that HUD may have thought the order applied to it. HUD asserts, however, that it joined the fray because it believed that the 1989 Order affected its general programmatic interests. Given the language of the 1989 Order, HUD's relation to PHA, and HUD's role in the funding of public housing, it is understandable that HUD would be interested in the appeal whether or not the order was directed at it. Moreover, the other side plainly did not believe the 1989 Order applied to HUD; at the time, BASIC protested HUD's standing to appeal on the very ground that the 1989 Order did not direct HUD to do anything. See PB-II, 907 F.2d at 1244 ("BASIC says that HUD lacks standing to appeal the [1989 Order], for the order tells PHA, not HUD, what to do.").[5] BASIC's assumption that HUD was not targeted by the 1989 Order demonstrates the plausibility of HUD's stated belief to that effect. And as we have said, uncertainty about the scope and purport of an order should be resolved in favor of a putative contemnor. Under the circumstances, HUD's role in PB-II cannot suffice either to clarify what is at best an ambiguous decree or to patch the hole in the lower court's contempt analysis.
 
 
 35
 We are also aware that HUD did not continue to litigate the 1989 Order, or seek a clarification of it, after PB-II was decided. In the overall scheme of things, this omission proves very little. Although the failure to seek a clarification of an order can in some situations betoken complacency toward safeguarding one's own rights, the failure here more likely reflected that (1) the wording of the 1989 Order gave HUD no warning that it would be subject to duties and sanctions thereunder, and (2) settlement negotiations were ongoing. In any event, given the posture of the current appeal, we must afford HUD the benefit of this doubt.
 
 
 36
 Of course, the district court, when it adjudged HUD in contempt in 1991, noted that its "clear intention at the time of the order was to bind HUD as well as ... PHA." 768 F.Supp. at 24. But the court's intentions, unstated at the time the 1989 Order was entered, cannot repair the shortcomings in the original order itself. The sanction of contempt may not be based upon an order that, by its terms, seems to be directed exclusively at another party, and in the bargain, fails to meet the requirements of clarity and definition demanded by our cases. Judicial intentions notwithstanding, "[p]ersons may not be placed at risk of contempt unless they have been given specific notice of the norm to which they must pattern their conduct." Wecht, 754 F.2d at 129. Put bluntly, a court's intentions and its orders are two different things.
 
 
 37
 To sum up, the language of the 1989 Order, fairly read, did not tell HUD to do anything, much less to do what the district court later sanctioned HUD for failing to do.[6] Since first principles counsel that no person shall be punished by contempt if he could not reasonably have known of the special standards with which the court expected him to comply, and since the contempt adjudication considered here subjects HUD to penalties for failing to perform according to standards that were not clearly ascertainable at the time, the adjudication, absent active concert or participation, see infra Part IV(B), cannot stand.
 
 
 38
 B. Active Concert or Participation.
 
 
 39
 In addition to requiring that injunctive decrees be specific, Fed.R.Civ.P. 65(d) also provides that every injunction shall be binding upon not only the party enjoined but also upon "those persons in active concert or participation with [enjoined parties] who receive actual notice of the order by personal service or otherwise." On appeal, Phoenix strives twice over to convince us that, even if the 1989 Order targeted PHA, not HUD, the "active concert or participation" stricture caught HUD in the order's toils. We are not persuaded.
 
 
 40
 1. Party Status. Phoenix itself acknowledges that the contempt order was not directly predicated upon Rule 65(d)'s "active concert or participation" language. The court below mentioned this language, however, in observing, accurately, that even non-parties may be held in contempt for violating court orders. The court reasoned that if a non-party could be bound by an order because the non-party was "in active concert or participation" with the party to whom the order was addressed (the targeted party), surely another party could be so bound. 768 F.Supp. at 25. We agree with this generality, as far as it goes--but it does not take us very far. Absent advance notice that an injunction's commands would bind both a targeted party and a non-targeted party, party status, without more, cannot subject the latter to the constraints of an injunctive decree addressed exclusively to the former. As the Second Circuit observed, were we to "adopt the principle that an express order to one party carries implications of duties imposed upon the other, it would be difficult to set limits upon the doctrine." Berry, 104 F.2d at 111.
 
 
 41
 The district court's reasoning is not assisted by its reliance on G. & C. Merriam Co. v. Webster Dictionary Co., 639 F.2d 29 (1st Cir.1980). Merriam suggests that non-parties are generally not bound by court orders because they have not had their day in court; in other words, they have not had a meaningful opportunity to challenge the orders' validity. See id. at 37. We agree with the court below that this principle offers HUD no shelter, inasmuch as HUD not only was a party in PB-I but participated in PB-II (the original appellate challenge to the 1989 Order). It is, however, a nonsequitur to say that HUD, because it was not protected by Merriam's day-in-court doctrine, was therefore constrained by the 1989 Order. The fact remains that the 1989 Order was so amphibolous, and the district court's subsequent interpretation so unpredictable, that HUD, prior to the proceedings in Phoenix-I, was deprived of the fair notice necessary to alert a non-targeted party to the uses to which its day in court might be put. On this record, claiming that HUD was bound solely because it challenged the 1989 Order is like saying that someone should be bound by an entire order, half of which is written in invisible ink, simply because he challenged the half that was visible.
 
 
 42
 2. Legal Identification. Phoenix also tries a parallel tack. Pouncing on various allusions that the district court made in reference to concert and participation, Phoenix theorizes that HUD, without regard to its status as a party, could nonetheless be held in contempt because the 1989 Order plainly applied to PHA, HUD was legally identified with PHA, and the two acted together in developing replacement housing.
 
 
 43
 In addressing this asseveration, we do not write on a pristine page. "The courts have interpreted the language ['active concert or participation with'] as requiring that a person either be 'legally identified with' a party in the case or 'aid and abet' the party to violate the decree." NBA Properties, 895 F.2d at 33 (citations omitted). It is difficult, if not impossible, to characterize HUD's conduct as aiding and abetting PHA in evading the dictates of the 1989 Order--especially since no one suggests that PHA had any intention of dodging, or took any action designed to dodge, its responsibilities under that order.
 
 
 44
 The appellees' better argument is that HUD was subject to the obligations imposed by the 1989 Order because it was legally identified with PHA. The district court, Phoenix says, intended all along that HUD be so subject; and, moreover, HUD's intimate involvement with PHA and with the litigation should have sufficed to put HUD on fair notice that the court meant HUD to conform its conduct to the order. To develop the legal identification theme, Phoenix, relying principally on Merriam, asserts that HUD had the power to direct PHA to do things (specifically, to withhold funds), thereby creating the requisite consubstantiality and, therefore, binding HUD by the 1989 Order through the mechanism of Fed.R.Civ.P. 65(d).[7] We think that Phoenix both misconstrues Merriam's analysis and misunderstands the relationship between HUD and PHA.
 
 
 45
 The Merriam court focused, first, upon the power the putative contemnor had to direct the targeted party in the proceedings in which the order was entered. In Merriam, it was shown that the putative contemnor enjoyed substantial control over the targeted party's "decisionmaking with respect to its litigation position in the original injunction proceeding." Merriam, 639 F.2d at 38. This power of direction was combined with other salient facts: the putative contemnor had been a "key employee" of the targeted party (a closely-held corporation), id. at 37; he "was the [second] most active person in the operation of the [targeted party]," id.; and the activities for which the putative contemnor had been cited were virtually identical with those proscribed by the original injunction, id. at 38. These convergent circumstances allowed the court to conclude that the putative contemnor was legally identifiable with the targeted party.
 
 
 46
 In sharp contrast to Merriam, nothing even faintly analogous to this factual array can be found in the record before us. Although HUD and PHA may have cooperated in the development of litigation strategies in PB-I and PB-II, each had its own counsel--and there is no reason to believe that HUD directed or controlled PHA's course in the original litigation. HUD and PHA are distinct entities, each representative of a separate sovereign and each with its own mission. That these missions may occasionally coincide is not enough to erase their separateness. Furthermore, HUD's ability to direct PHA's disbursements is limited by a network of specific contractual and regulatory provisions. Limited powers of this kind, without more, are hardly the stuff of legal identification. For these reasons, Merriam is not apposite to the HUD/PHA relationship.[8]
 
 
 47
 Whether seen as a matter of party status or of legal identification, then, the contempt order against HUD cannot be justified under the rubric of "active concert or participation."
 
 V. CONCLUSION
 
 48
 The 1989 Order neither adequately informed HUD of what the district court subsequently said it intended nor clearly and unequivocally told HUD that it would have to fund construction of replacement housing regardless of any federal law, regulation, or contractual provision to the contrary. Thus, HUD's directive to withhold the disputed $500,000 payment was not an act of contempt. While we appreciate the urgency of the housing shortage that Providence faces and recognize that the district court has labored valiantly to ameliorate that problem, the judicial remedy employed here was simply too much of a reach.
 
 
 49
 We need go no further.[9] Where the rule of law prevails, courts must operate within the framework of jurisprudence. Hence, litigants' and jurists' objectives, no matter how laudable, can be achieved only through and in conformity with established standards. At its core, this case exemplifies one of the most basic of these standards: no one may be punished, under our system of justice, for failing to conform his conduct to rules that he could not ascertain.
 
 
 50
 The contempt order is reversed and the case is remanded to the district court for such further proceedings as may be appropriate.
 
 
 
 *
 Of the District of Massachusetts, sitting by designation
 
 
 [1]
 The contempt order is aimed at HUD, the Secretary being named as a defendant in his official capacity. Both HUD and the Secretary appeal. For convenience, we refer to the appellants, collectively, as HUD
 
 
 [2]
 The memorandum deals exclusively with the question of contempt. The court below did not rule, and to this date has never ruled, on Phoenix's motion for preliminary injunctive relief
 
 
 [3]
 None of the parties question--and we are independently satisfied--that we have jurisdiction to hear and consider this appeal. While contempt orders are generally not immediately appealable, because they are ordinarily not final, the exceptions to this precept are numerous. See Morales-Feliciano v. Parole Board, 887 F.2d 1, 3 (1st Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 1511, 108 L.Ed.2d 646 (1990). Here, the district court's decision to hold HUD in contempt has the quality of finality required for an order to be immediately appealable. See id. at 3-4
 
 
 [4]
 A multitude of other issues raised by the parties, including issues related to the policy implications of the litigation below, the federal government's role in solving the persistent housing problems that plague Providence and other inner cities, and the applicability vel non of various federal regulations to Phoenix's work sites, lie well outside the encincture of this appeal. Consequently, while acknowledging their generic importance, we do not address them here
 
 
 [5]
 We elected to leave the issue of HUD's standing unresolved, because PHA's acknowledged standing was sufficient to allow the appeal to go forward. PB-II, 907 F.2d at 1244
 
 
 [6]
 Although supererogatory in view of the 1989 Order's failure to target HUD, we note that, even if the order could reasonably be read to direct HUD to do something--and we doubt that it can--the order certainly does not tell HUD, in the district court's later phrase, 768 F.Supp. at 25, to do "everything within its power to move the [replacement housing] project toward completion." By the same token, the text of the 1989 Order most assuredly does not suggest that if DOL requires HUD to withhold funds on account of the general contractor's method of operation, HUD must then depart from its normal practice, override the terms of existing contracts and regulations, and execute a change order that would effectively circumvent the reservation of funds lawfully ordered by a sister agency. See 29 C.F.R. § 5.9 (1990) (authorizing DOL orders to enforce prevailing wage-rate laws); see also Davis-Bacon Act, 40 U.S.C. §§ 276a to 276a-5 (1988). Yet, this is approximately the interpretation given the 1989 Order by the district court. Targeting problems aside, such an interpretation cannot withstand scrutiny
 
 
 [7]
 It is unclear whether the district court actually subscribed to the thesis that HUD's ability to control PHA's funding decisions rendered it legally identifiable with PHA. We assume, purely for argument's sake, that the court may have so inferred
 
 
 [8]
 We note that there is seemingly another problem with the appellees' "legal identification" approach. We doubt that it can seriously be contended that HUD was the instrumentality through which PHA carried out contumacious acts. Inasmuch as the court below ruled specifically that PHA was not in contempt, it would seem that HUD, even if legally identified with PHA, was not thereby identified with a contemnor
 
 
 [9]
 We take no position on whether Phoenix actually violated the Davis-Bacon Act or whether Davis-Bacon wage rates were legally required in the circumstances of this project