**METRO–GOLDWYN MAYER, INC., Danjaq, Inc., and Eon Productions, Ltd., Plaintiff–Appellees,**

v̇.

**007 SAFETY PRODUCTS, INC., Defendant, Appellant.**

**No. 98–2160.**

United States Court of Appeals, First Circuit.

Heard May 5, 1999.

Decided July 7, 1999.

---

Philip X. Murray for appellant.

Nicholas C. Theodorou, with whom John A. Shope, Sarah Cooleybeck and Foley, Hoag & Eliot, LLP were on brief for appellees.

Before TORRUELLA, Chief Judge, CYR, Senior Circuit Judge, and POLLAK,* Senior District Judge.

CYR, Senior Circuit Judge.

Defendant 007 Safety Products, Inc. ("Safety Products") appeals a district court order which enjoined Safety Products and related parties from violating a settlement agreement with the alleged owners of the trademarks "James Bond" and "007." We affirm.

# I

## BACKGROUND

Safety Products, which manufactured and sold such products as tear gas and pepper spray, was founded by Ronald Pasqualino in 1990. Ronald designed product packaging which included a logo depicting the numerals "007" superimposed on a spray can ("007 spray can logo"). In 1994, Angelo Pasqualino, Ronald's brother, became a partner in Safety Products. As Safety Products was virtually insolvent, Angelo personally invested $150,000, and incorporated the company, designating himself as president, and himself and his wife, Patricia, as the only corporate offi-

---

* Of the Eastern District of Pennsylvania, sitting by designation.

cers, directors, and shareholders. Patricia took no part in operating the business, nor did the corporation convene directors meetings, issue corporate shares, or declare dividends.

In return for his services, including his solicitation of business accounts, Ronald received $300 per week. Safety Products deducted these payments on its tax returns as salary expense. Ronald also applied for a trademark on the 007 spray can logo. The trademark application was actively opposed by plaintiff-appellee Danjaq, Inc., which itself claimed the trademark for the James Bond "007" can logo.

In April 1996, Danjaq, Inc., Metro–Goldwyn–Mayer, Inc., Eon Productions, Ltd., and MAC B, Inc. (collectively: "Danjaq") brought suit in federal district court, claiming that Safety Products' 007 spray can logo infringed their registered trademarks. The district court declined Danjaq's request for preliminary injunctive relief in July 1996. Rather than take an interlocutory appeal, Danjaq elected to enter into a settlement agreement with Safety Products, which prescribed, *inter alia*, that: (1) Danjaq pay Safety Products $150,000; (2) Safety Products be permitted to continue to use "007" in its corporate name, but be prohibited from using "007," "James Bond," or the associated logos in its product packaging or advertising; (3) Safety Products file—or "ensure that Ronald Pasqualino, and or . . . any other appropriate person . . .—. . . file the appropriate documents necessary to abandon" the pending trademark application for the 007 spray can logo; and (4) the parties "take all reasonable steps . . . to persuade the district court to vacate [its July 1996 order denying Danjaq a preliminary injunction]" and refrain from interim release and publication of its July 1996 order. Ronald Pasqualino was not mentioned in the Agreement, which was executed by Angelo as president of Safety Products.

Danjaq promptly remitted the $150,000 to Safety Products, which wired $50,000 to a bank account controlled by Ronald, designating it in the company books as "Ronnie's share" of the settlement proceeds. On June 23, 1997, Ronald withdrew his trademark application. The district court in turn vacated its earlier July 1996 order denying preliminary injunctive relief to Danjaq.

On August 13, 1997, Danjaq informed the court of the settlement. The court conditionally dismissed the case, subject to its reopening in the event the settlement was not consummated within sixty days. Five weeks later, however, Ronald filed an application with the United States Patent and Trademark Office ("Trademark Office") to reinstate his trademark application. In addition, he threatened to publish the vacated July 1996 order on the Internet unless Danjaq paid him money over and above the $150,000 already paid to Safety Products.

On October 9, 1997, Danjaq moved to set aside the conditional dismissal entered by the district court on August 13, and to enforce the Settlement Agreement. Meanwhile, the Trademark Office denied the pending application to reinstate the trademark application withdrawn by Ronald Pasqualino on June 23.

At the district court hearing on Danjaq's motion to set aside the conditional dismissal entered on August 13, Danjaq contended that Ronald—though neither a named party nor a signatory to the Settlement Agreement—was so "legally identified" with Safety Products as to have become contractually bound as its agent, *see* Fed. R.Civ.P. 65(d); *infra* Section II.C. Following extensive discovery on this issue, the district court permanently enjoined Safety Products, and others in active concert with it (including Ronald Pasqualino), from further attempts to reinstate the withdrawn trademark application or to publish the vacated July 1996 order on the Internet. In due course, Safety Products appealed.

## II

## DISCUSSION

### A. Subject Matter Jurisdiction

██ Safety Products first contends that the district court lacked subject matter jurisdiction to enter final judgment and issue the injunction. It relies on the principle that federal district courts normally lack either the authority to impose a subsequent condition on a dismissal entered with prejudice based on a stipulation of dismissal with prejudice pursuant to Fed. R.Civ.P. 41(a)(1)(ii) ("[A]n action may be dismissed by the plaintiff without order of court ... by filing a stipulation of dismissal signed by all parties who have appeared in the action."), or the jurisdiction to reopen a dismissed case to enforce a settlement. See Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 378, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994); cf. Fed.R.Civ.P. 41(a)(2) (providing that, "[e]xcept as provided in [Rule 41(a)(1) ], an action shall not be dismissed at the plaintiff's instance save upon order of the court and upon such terms and conditions as the court deems proper"). Even though Danjaq and Safety Products filed no such stipulation of dismissal with prejudice, Safety Products contends that the district court nonetheless lost jurisdiction because Danjaq breached its settlement agreement by failing to file the stipulation. See supra Section I. We do not agree.

First, Kokkonen terminates jurisdiction only after the Rule 41(a)(1)(ii) stipulation has been filed.[1] Thus, Danjaq's failure to file the required stipulation is dispositive.

Second, the Court also explained in Kokkonen that even after the parties file a Rule 41(a)(1)(ii) stipulation the district court retains the power to enforce the settlement agreement provided the dismissal order expressly incorporates the settlement agreement, or expressly preserves jurisdiction over the settlement agreement. See Kokkonen, 511 U.S. at 381–82, 114 S.Ct. 1673 ("Even when, as occurred here, the dismissal is pursuant to Rule 41(a)(1)(ii) (which does not by its terms empower a district court to attach conditions to the parties' stipulation of dismissal) we think the court is authorized to embody the settlement contract in its dismissal order (or, what has the same effect, retain jurisdiction over the settlement contract) if the parties agree."); Pratt v. Philbrook, 109 F.3d 18, 21 n. 5 (1st Cir.1997).

The Settlement Agreement in the instant case clearly did not preclude retention of jurisdiction by the district court. Cf. Hester Indus., Inc. v. Tyson Foods, Inc., 160 F.3d 911, 913, 916 (2d Cir.1998) (finding no jurisdiction where settlement agreement prohibited entry of any judgment or injunction against either party). Quite the contrary, the dismissal order entered by the district court expressly retained jurisdiction over the settlement agreement for sixty days, and Safety Products neither objected nor insisted on its right to an unconditional Rule 41(a)(1)(ii) dismissal. Cf. Gardiner v. A.H. Robins Co., 747 F.2d 1180, 1189–90 (8th Cir.1984) (finding no jurisdiction where parties to stipulated dismissal neither knew about or agreed to retention of jurisdiction).

### B. Scope of Injunction

██ Safety Products next contends that the district court abused its discretion by enjoining Safety Products from further efforts to reinstate its withdrawn trademark application and from threatening to publish the vacated July 1996 preliminary injunction order on the Internet. See A.W. Chesterton Co. v. Chesterton, 128 F.3d 1, 5 (1st Cir.1997) (appellate court reviews grants of permanent injunctive relief for

---

1. Contrary to Safety Products' contention that it is enough that "the dismissal was contemplated [by the parties] to be effectuated by stipulation [ ]," in each case cited by Safety Products a stipulation of dismissal had been filed. See, e.g., Hester Indus., Inc. v. Tyson Foods, Inc., 160 F.3d 911, 913 (2d Cir.1998).

abuse of discretion);[2] *see also* Fed. R.Civ.P. 65.

### 1. *Trademark Abandonment*

■ The district court determined that Safety Products violated the settlement agreement provision requiring it to abandon the 007 spray can trademark application. *See* Agreement ¶ 4(g). It held that "[a] withdrawal followed by a 'withdrawal of a withdrawal' is obviously not [an] effective abandonment." Safety Products responds that it did not breach the settlement agreement since the Trademark Office determined that its attempt to withdraw the abandonment was ineffectual.

Danjaq counters that the reinstatement application filed by Safety Products remained pending before the Trademark Office at the time Danjaq filed its motion to enforce the settlement, and, therefore, Danjaq was entitled to prospective injunctive relief. Be that as it may, by the time the district court permanently enjoined Safety Products, the Trademark Office had ruled that Safety Products could *not* withdraw its June 23 abandonment.

■ Normally, courts may not enjoin conduct if "(1) it can be said with assurance that 'there is no reasonable expectation ...' that the alleged violation will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979) (citations omitted). Danjaq argues, however, that since Ronald Pasqualino had on one occasion filed a motion for reconsideration of the Trademark Office's decision to deny his reinstatement application, "there is no indication that he would have stopped requesting 'reconsideration' in the absence of the District Court's injunction."

■ "The burden of demonstrating mootness is a 'heavy one,' " *id.* (citation omitted), and it fell to Safety Products to demonstrate that its past attempts to reinstate the trademark application likely would not recur. Safety Products, which filed no reply brief on appeal, has not attempted to meet its burden. That is, it does not contend—let alone attempt to prove—that Trademark Office procedures precluded it from filing either successive motions to reconsider or successive motions to set aside its June 1997 abandonment on grounds not raised previously. Given Ronald Pasqualino's prior conduct, we cannot conclude that Danjaq's concerns about being brought before the Trademark Office again absent injunctive relief were unfounded.

### 2. *Preliminary Injunction Order*

■ Safety Products next contends that the Settlement Agreement did not prevent it from disseminating the July 1996 preliminary injunction over the Internet, but instead mandated only that it join with Danjaq in persuading the district court to vacate the July 1996 order, and refrain from publishing the order "in any official reporter *or in any other medium,* including but not limited to the LEXIS and Westlaw electronic databases." *See* Agreement ¶ 4(c) (emphasis added). Since it cooperated in getting the district court to vacate the order and halt its interim publication, Safety Products argues ·that Ronald Pasqualino's dissemination of the vacated order on the Internet would not have breached the literal terms of the Settlement Agreement.

■ Safety Products' interpretation of the Settlement Agreement strikes us as high octane sophistry. First, although ¶ 4(c) literally addresses only the district court's publication of the vacated order, as

---

**2.** Before a permanent injunction may issue, the district court must find that (1) plaintiff prevailed on the merits of its claim; (2) plaintiff would suffer irreparable harm absent injunctive relief; (3) the harm to plaintiff would outweigh any harm to defendant; and (4) the injunction does not adversely affect the public interest. *Id.* This appeal implicates only the first requirement.

a whole ¶ 4(c) evinces a reasonable expectation on the part of Danjaq that Safety Products was to take good faith measures to ensure that the order was not published in any of the enumerated media. Second, in ¶ 16, Safety Products agreed that "the Terms of this Agreement (including, but not limited to, the matters enumerated in paragraph 4 above), shall remain confidential, and shall not be disclosed to any person or entity.... In the event any person should inquire of any of the parties concerning the action or products' claims, the party of whom the inquiry is made may say that the matter has been fully and finally resolved, but shall not say any more." Thus, the confidentiality clause expressly precluded not only disclosure of the terms in ¶ 4, but any "matters" enumerated in ¶ 4, thereby plainly encompassing the text of the vacated order. Contracts include an implied covenant that all parties shall perform their contractual obligations in good faith. *See James L. Miniter Ins. Agency, Inc. v. Ohio Indemnity Co.*, 112 F.3d 1240, 1249 (1st Cir.1997). Safety Products reasonably cannot claim that its only obligation was to persuade the district court not to publish the vacated order on the Internet, but that Safety Products itself remained free to do so.

## C. *"Legal Identification"*

 Federal Rule of Civil Procedure 65(d) provides that an order granting an injunction "is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise." *See G. & C. Merriam Co. v. Webster Dictionary Co.*, 639 F.2d 29, 36 (1st Cir.1980) (" '[D]efendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding.' ") (citation omitted). Safety Products argues that the district court erred in finding that Ronald Pasqualino was "legally identified" with Safety Products, and therefore personally bound by the settlement agreement.[3]

 The "legal identification" test focuses on whether Ronald Pasqualino's participation in Safety Products was sufficiently significant to make him a *de facto* participant in the Settlement Agreement. *See id.* at 37–38. Safety Products acknowledges that the factual finding of "legal identification" may not be disturbed unless clearly erroneous. *See id.* at 38. There is ample record support.

Ronald co-founded Safety Products. Safety Products' attorney referred to Ronald as its co-"owner." Ronald designed the 007 spray can logo, and applied for the trademark. *See id.* ("Advertisements designed, written, and placed by [the legally identified person] precipitated the injunction."). During the period from 1994–97, Ronald received more than $10,000 in compensation for services performed for Safety Products, which amount was deducted by Safety Products on its tax returns as a business expense. Angelo Pasqualino consulted Ronald during the settlement negotiations with Danjaq, and sent him copies of the Agreement and related documents for review. *See Project B.A.S.I.C.* v. *Kemp*, 947 F.2d 11, 20 (1st Cir.1991) (noting that *Merriam* test is satisfied where the legally identified person "enjoyed substantial control ... decisionmaking with respect to [defendant's] litigation position"). Safety Products paid Ronald $50,000 ("Ronnie's share") from the $150,000 it received from Danjaq under the Settlement Agreement. *See id.* ("The record

---

3. Safety Products also contends that Danjaq is judicially estopped from arguing that Ronald Pasqualino was "legally identified" with 007 Safety Products because of an allegedly inconsistent litigation position taken by Danjaq in proceedings before the Trademark Board. We decline to address this argument, since Safety Products has not demonstrated that it was raised below. *See Arthur D. Little, Inc. v. Dooyang Corp.*, 147 F.3d 47, 54 n. 10 (1st Cir.1998) (noting that arguments not raised below are waived on appeal).

supports an inference that [the legally identified person's] responsibilities were substantial, as was his expectation of remuneration if the venture was successful.").

Safety Products neither contends that the district court findings lack record support nor that the above-cited evidence is immaterial to the "legal identification" inquiry. Rather, it catalogs snippets of evidence which might conceivably support a contrary finding. Since the district court was the factfinder, however, and none of the catalogued evidence conclusively established that Ronald was not "legally identified" with Safety Products, we will not disturb its factual finding.[4] *Ramos v. Davis & Geck, Inc.*, 167 F.3d 727, 733 (1st Cir.1999) (" '[W]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.' ") (citation omitted).

*Affirmed; costs to appellees.*

---

**4.** Safety Products cites evidence that Angelo Pasqualino and his wife were the sole directors, officers, and shareholders of Safety Products, and that Angelo adequately "explained" that Safety Products' payments to Ronald were merely "loans" which Ronald never repaid. Given the evidence that Ronald took an active role in Safety Products' development, and that the company's corporate structure was extremely informal and often ignored, the district court was not required to accept Angelo's contrary characterizations regarding Ronald's participation, nor to confine its inquiry to the formalities of corporate organization. *See G. & C. Merriam*, 639 F.2d at 38 (noting that person need not be formally named an officer to be "legally identified" with corporation). Similarly, as to the alleged "loans," the district court was not bound to accept Angelo's testimony concerning his intent, especially in light of evidence that Ronald actively performed services for the company, including the filing of the trademark registration. Coupled with Ronald's failure to repay, and the company's recordation of the payments as tax deductible business expenses, surely it was rational to infer that Ronald received the funds for services rendered. *Cf. Crowley v. Commissioner*, 962 F.2d 1077, 1079–80 (1st Cir.1992) (in tax cases, characterization of payment as loan or salary is a factual determination reviewed only for clear error).