# United States Court of Appeals
## For the First Circuit

Nos. 01-1928
     01-2497

GOYA FOODS, INC.,
Petitioner, Appellee,

v.

WALLACK MANAGEMENT CO. ET AL.,
Respondents, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge]

Before

Selya, Circuit Judge,

Coffin, Senior Circuit Judge,

and Lipez, Circuit Judge.

Stuart W. Berg, with whom Baer, Marks & Upham LLP was on brief, for respondents-appellants Wallack Management Co. and 625 Park Corp.
H. Peter Haveles, Jr., with whom Cadwalader, Wickersham & Taft was on brief, for respondent-appellant Ira Leon Rennert.
Arturo J. García-Solá, with whom Ira Brad Matetsky and McConnell Valdés were on brief, for appellee.

May 17, 2002

**SELYA**, **Circuit Judge**.  These appeals represent yet another chapter in a seemingly interminable intrafamilial dispute that has run a litigatory gauntlet stretching from Puerto Rico to New Jersey.  See, e.g., Goya Foods, Inc. v. Unanue-Casal, 275 F.3d 124 (1st Cir. 2001); Goya Foods, Inc. v. Unanue, 233 F.3d 38 (1st Cir. 2000), cert. denied, 532 U.S. 1022 (2001); Quiros Lopez v. Unanue Casal (In re Unanue Casal), 998 F.2d 28 (1st Cir. 1993); Unanue-Casal v. Unanue-Casal, 898 F.2d 839 (1st Cir. 1990); Goya Foods, Inc. v. Unanue-Casal, 141 F. Supp. 2d 207 (D.P.R. 2001); Goya Foods, Inc. v. Unanue-Casal, 982 F. Supp. 103 (D.P.R. 1997); Goya Foods, Inc. v. Unanue-Casal (In re Unanue-Casal), 164 B.R. 216 (D.P.R. 1993); Goya Foods, Inc. v. Unanue-Casal (In re Unanue-Casal), 159 B.R. 90 (D.P.R. 1993); Quiros-Lopez v. Unanue-Casal (In re Unanue-Casal), 144 B.R. 604 (D.P.R. 1992); Unanue Casal v. Unanue Casal, 132 F.R.D. 146 (D.N.J. 1989); In re Settlement of Accounts of Unanue, 710 A.2d 1036 (N.J. Super. Ct. App. Div. 1998); In re Settlement of Accounts of Unanue, 605 A.2d 279 (N.J. Super. Ct. Law Div. 1991).  This chapter arises out of a matched set of interlocutory orders entered by the district court with a view toward barring the transfer of certain assets held in the name of the wife of a judgment debtor (including a lavish Park Avenue cooperative apartment).  Despite their knowledge of these court orders, the appellants — Wallack Management Co., 625 Park Corporation, and Ira Leon Rennert — participated in a sale of the

apartment.  Acting on the petition of the original plaintiff, Goya Foods, Inc., the district court found the appellants in contempt, and awarded substantial monetary sanctions.  The appellants ask us to overturn (or, at least, to modify) this award.

The outcome of these appeals hinges primarily upon a complex issue of first impression as to whether Goya's failure to comply strictly with the requirements for perfecting orders prohibiting the alienation of property resulted in the expiration of those orders upon the court's subsequent entry of judgment in the underlying case (and, therefore, left the appellants free to consummate the challenged transaction).  This close question has been well briefed and argued on both sides by able counsel.  We conclude that, notwithstanding Goya's failure to satisfy the literal requirements of Rule 56.4 of the Puerto Rico Rules of Civil Procedure, the relevant orders remained legally binding upon the appellants, given their actual knowledge of the prohibition.  Largely on that basis, we affirm the district court's contempt findings against the appellants.  We find no fault with the court's choice of a monetary sanction, but we conclude that the court misapprehended the relationship of prejudgment interest to that award.  Consequently, we vacate the separate award of prejudgment interest and remand for reconsideration of the amount of the monetary sanction.

## I. BACKGROUND

In setting the stage, we draw heavily upon our previous distillation of the relevant facts. See Goya Foods, Inc. v. Unanue, 233 F.3d at 41-42. We add details only where necessary.

Goya was founded by Charles Unanue's father in 1936. The company prospered. Charles served as a Goya executive from the late 1940s until 1969, when internecine warfare led to his ouster. This, in turn, prompted no-holds-barred litigation involving Goya, Charles, Charles's father, and other relatives. Pursuant to settlements reached in 1972 and 1974, Charles received more than $4,400,000; in exchange, he surrendered his ownership interest in Goya and agreed that he would neither contest his father's will nor file any claims against his father's estate. The settlement agreements further provided that if any signatory wrongfully sued another signatory, the transgressor would be liable for liquidated damages equal to twice the victor's litigation expenses.

Charles's father died in 1976. Eleven years later, Charles claimed that he was entitled to an inheritance from his parents' estates (including certain Goya shares that his father had placed in trust). The trustees resisted the claim and sought a judgment in a New Jersey state court barring Charles from maintaining any action against either the trust or his parents' estates. After protracted litigation, the New Jersey court enforced the 1974 settlement agreement, enjoined Charles from

pressing further claims of entitlement, and entered judgment for Goya, pursuant to the liquidated damages clause, for approximately $6,900,000. In re Unanue, No. M-128817 (N.J. Super. Ct. Ch. Div. 1995) (unpublished opinion).

In the midst of this odyssey, Charles repaired to Puerto Rico and filed a petition for personal bankruptcy. From that point forward, the battle continued in both New Jersey and Puerto Rico. Among other initiatives, Goya filed an adversary proceeding in the bankruptcy court in which it contended that Charles was concealing assets by placing them in the names of various straws (including his wife, Liliane Unanue).

Eventually, the bankruptcy court dismissed Charles's insolvency petition without granting him a discharge. In re Unanue-Casal, No. 90-04490, slip op. at 5 (Bankr. D.P.R. 1995). With the shield of bankruptcy shattered and a state court judgment in hand, Goya mounted a new offensive. It sued Charles and Liliane Unanue in Puerto Rico's federal district court, asserting that Charles was the beneficial owner of various assets held in Liliane's name, and, therefore, that it was entitled to reach and apply those assets to satisfy the New Jersey judgment. To ensure against dissipation of the assets, Goya moved for the imposition of provisional remedies.

The district court granted the motion on November 17, 1995, and issued an ex parte order prohibiting the alienation of

various properties held in Liliane's name. Pertinently, the order encompassed a cooperative apartment located at 625 Park Avenue in New York City (the Apartment). In a companion order, the court barred any transfer or other alienation of the cooperative shares memorializing Liliane's interest in the Apartment.[1] Goya then transmitted copies of the district court's orders to both 625 Park (the cooperative housing association that owned the building) and Wallack Management (the building's managing agent).

Almost two years later, the district court resolved the underlying litigation, holding, inter alia, that Charles was the beneficial owner of the cooperative shares and the Apartment, and entering judgment to that effect. Goya Foods, Inc. v. Unanue-Casal, 982 F. Supp. at 109-12. Although the ruling ordinarily would have cleared the way for Goya to levy against the Apartment, the court stayed execution pending appellate review. Id. at 112. In February 1998, Goya informed both Wallack Management and 625 Park of the district court's decision and requested that it be notified before any disposition was made of the Unanues' interest in the Apartment.

_____

[1]A cooperative apartment is one that is owned by a corporation (the cooperative). The ownership interest in the apartment is held and conveyed in the form of shares in the corporation (known as cooperative shares). A shareholder's right to occupy the particular apartment that he or she "owns" derives from a proprietary lease entered into between the corporation (qua landlord) and the shareholder (qua tenant).

That same month, Wallack Management informed Liliane that she was in default of her obligation to make mandatory maintenance payments to the cooperative, and that 625 Park would terminate her interest and take possession of the Apartment unless she cured the default. Adverting to this threat, Liliane asked the district court for permission to sell the Apartment, and her attorney informed Wallack Management that she had filed such a motion. The court did not rule upon the request, but, rather, ordered counsel to meet and discuss possible solutions to the dilemma.

In May 1998, Liliane agreed to sell the Apartment to Rennert for $4,600,000. Prior to the closing, Rennert's attorneys discovered that Goya had neglected either to record a cautionary notice of lis pendens in the Manhattan land records or to file a Uniform Commercial Code (UCC) statement anent the cooperative shares. Concluding that the November 1995 orders had lapsed when the district court entered judgment in November of 1997, Rennert's counsel advised him that no effective judicial restraint precluded Liliane from conveying clear title to the Apartment.[2]

The bylaws of the cooperative required 625 Park's approval of any transfer of shares. After consultation with counsel, 625 Park's board ratified the proposed sale of Liliane's

_____

[2]This conclusion was not self-evident. The attorney originally retained by Liliane bowed out of the transaction based on his belief that the proposed sale would, if consummated, violate the November 1995 orders.

-7-

shares (and, effectively, of the Apartment), on condition that Rennert indemnify it for all loss, cost, or damage (including litigation expenses) resulting from any challenge to the sale. Rennert agreed to hold both Wallack Management and 625 Park harmless, and the transaction proceeded.

The closing took place in June of 1998. From the $4,600,000 purchase price, Wallack Management, acting as Liliane's broker, received a $276,000 commission. Liliane's net proceeds (well in excess of $4,000,000) were wired to a Swiss bank account. The final version of the sales agreement included a confidentiality clause.

Goya did not learn of the transaction until October of 2000. It immediately brought the matter to the district court's attention. The court directed Charles and Liliane to appear personally and show cause why they should not be adjudged in contempt for violating the November 1995 orders. When neither defendant appeared at the appointed time — the record suggests that both Charles and Liliane sought sanctuary abroad — the court held them in contempt, issued warrants for their arrest, and dissolved the preexisting stay (thus allowing execution of the outstanding judgment). Twenty-three days later, we affirmed the district court's original judgment. We upheld, inter alia, the finding that several properties held in Liliane's name (including the Apartment

and the cooperative shares) were in actuality owned by Charles. Goya Foods, Inc. v. Unanue, 233 F.3d at 44-46, 48.

Goya next petitioned the district court to hold Wallack Management, 625 Park, and Rennert in civil contempt for defying the November 1995 orders. The court directed the appellants to show cause why they should not be so cited. The appellants made a proffer but, following Goya's counter-proffer and a non-evidentiary hearing, the district court determined that all three appellants had violated the November 1995 orders by participating in the purchase of the Apartment and the cooperative shares despite their actual knowledge of those orders. Goya Foods, Inc. v. Unanue-Casal, 141 F. Supp. 2d at 219, 224. Accordingly, the court adjudged the appellants in civil contempt, and held them jointly and severally liable to Goya for the $4,600,000 purchase price.[3] Id. at 224. Although the appellants filed a notice of appeal, Rennert, acting pursuant to a court order, deposited the sum of $4,6000,000 in the registry of the district court (presumably in lieu of a supersedeas bond). After some further skirmishing (not relevant here), the court embellished the original award with prejudgment interest. Goya Foods, Inc. v. Unanue-Casal, Civ. No. 95-2411 (D.P.R. Oct. 5, 2001) (unpublished opinion). A second

---

[3]The district court also stated that it would grant attorneys' fees to Goya, see Goya Foods, Inc. v. Unanue-Casal, 141 F. Supp. 2d at 224, but the record on appeal contains no indication that a fee award has eventuated. In all events, these appeals do not raise any issues anent attorneys' fees.

appeal followed.  We consolidated the two appeals for briefing and oral argument.

Our analysis is divided into three parts.  We start by grappling with the thorny issue of whether the unperfected November 1995 orders survived the entry of judgment in November 1997.  Next, we address the other aspects of the district court's finding of contempt.  Finally, we review the assessment of a monetary sanction and the award of prejudgment interest.

## II.  THE NOVEMBER 1995 ORDERS

The crux of these appeals is whether the November 1995 orders precluding the transfer of the Apartment and the cooperative shares were legally effective against the appellants when Rennert acquired the assets in June of 1998.  Our starting point is the acknowledged power of a federal district court to issue orders "providing for seizure . . . of property for the purpose of securing satisfaction of the judgment ultimately to be entered in the action."  Fed. R. Civ. P. 64.  By its terms, that rule allows a federal court to borrow provisional remedies created by state law.  For this purpose, Puerto Rico is deemed the functional equivalent of a state.  E.g., HMG Prop. Investors, Inc. v. Parque Indus. Rio Canas, Inc., 847 F.2d 908, 912-13 (1st Cir. 1988).

Following this paradigm, the court below made use of Rule 56 of the Puerto Rico Rules of Civil Procedure, 32 P.R. Laws Ann. app. III, R. 56.  In pertinent part, that rule empowers a court, on

an ex parte application, to issue provisional remedies that it deems "necessary to secure satisfaction of [an anticipated] judgment." Id. R. 56.1. Such remedies include "an order of attachment or of prohibition to alienate." Id. R. 56.4. The rule then provides, however, that:

> The attachment and prohibition to alienate real property shall be effected by recording them with the Registry of Property and notifying the defendant. In case of personal property, the order shall be carried out by depositing the personal property in question in court or with the person designated by it under the claimant's responsibility.

Id.

The appellants appear to concede, at least tacitly, that the district court intended the November 1995 orders to secure Goya's potential recovery against Charles Unanue, and that those orders constituted legally binding restraints while Goya's case against Charles and his ostensible straws (including Liliane) was pending in the district court. The appellants maintain, however, that when the court entered final judgment in that case in November of 1997 — in their view, the stay of execution and the ensuing appeal make no difference — the provisional remedies envisioned by those orders lapsed because Goya had not perfected them as required by Rule 56.4.

This argument derives from the language of Rule 56.4. Focusing on the drafters' use of the word "shall," the appellants posit that the rule's recordation and seizure requirements are

-11-

obligatory. Since the remedies granted by the district court vis-à-vis the Apartment and the cooperative shares were provisional and Goya never properly perfected them (it neither recorded the prohibition against alienation of the Apartment nor ensured that the cooperative shares were physically seized and delivered to the court or some other properly designated custodian), the appellants argue that those remedies expired upon the entry of judgment and, thus, were no longer in effect some seven months later (when Rennert acquired the assets).

Distilled to bare essence, we must determine the effect of Goya's failure to comply with the recordation and seizure requirements of Rule 56.4 prior to the district court's entry of judgment. In the first instance, this is an abstract legal question. Consequently, we afford de novo review. McCarthy v. Azure, 22 F.3d 351, 354 (1st Cir. 1994); Liberty Mut. Ins. Co. v. Comm'l Union Ins. Co., 978 F.2d 750, 757 (1st Cir. 1992).

The district court held that strict compliance with the recordation and seizure requirements of Rule 56.4 was not necessary in every situation. Goya Foods, Inc. v. Unanue-Casal, 141 F. Supp. 2d at 219. At first blush, that holding squares with the core principle that undergirded our decision in HMG Property Investors. There, we noted that the Supreme Court of Puerto Rico has construed Rule 56 expansively:

> Rule 56 of the Rules of Civil Procedure
> confers upon the court sufficient flexibility

> to issue the measures which it deems necessary or convenient, according to the circumstances of the case, to secure the effectiveness of the judgments. Its only limitation is that the measure be reasonable and adequate to the essential purpose of the same, which is to guarantee the effectiveness of the judgment which in due time may be rendered. This flexibility, so necessary for the administration of justice, is the greatest virtue of Rule 56, virtue which we should promote and preserve instead of mystifying it with technical concepts and requirements.

847 F.2d at 913-14 (quoting F. D. Rich Co. v. Super. Ct., 99 P.R.R. 155, 173 (1970)). As this passage evinces, and as we concluded in HMG Property Investors, flexibility is the hallmark of Rule 56.

This emphasis on flexibility is important in considering how Rule 56.4's recordation and seizure requirements are intended to operate. At bottom, those requirements serve to protect the interests of innocent third parties (e.g., potential acquirers) who come upon the scene unaware that property standing in a defendant's name is subject to a priority lien. The recordation and seizure requirements enable such a third party, in the exercise of due diligence, to learn about attachments, restrictions on alienation, and other impediments to the passage of marketable title. See, e.g., 30 P.R. Laws. Ann. § 2051 (explaining that one of the purposes of the Puerto Rico Registry of Property is to facilitate the recordation of "judicial opinions which may affect the legal capacity of the owners of record").

We think it follows that if the raison d'etre of the recordation and seizure requirements is to furnish notice that specific property is subject to a court-imposed restriction, the receipt of actual notice by a particular third party about the existence of that restriction satisfies the rule's notice-giving function as to that party. Indeed, insisting upon strict compliance with the recordation and seizure requirements as to a third party possessing such knowledge would plunge the courts into the very vortex that the Supreme Court of Puerto Rico has endeavored to avoid. See F. D. Rich Co., 99 P.R.R. at 173 (warning against "mystifying" Rule 56 "with technical concepts and requirements").

In this spirit, the Puerto Rico courts have demonstrated their readiness to look to the facts and circumstances of each case, as opposed to requiring unblinking, lockstep compliance with the recordation and seizure requirements of Rule 56.4. The decision in Freeman v. Superior Court, 92 P.R.R. 1 (1965), is a good example. There, corporate shareholders aspired to block a real estate transaction on the ground that the defendant was not authorized to act on the corporation's behalf. Id. at 6-7. They obtained an interlocutory order forbidding the parties to the transaction from consummating it and served the order on the affected parties. In an ensuing challenge, the Supreme Court of Puerto Rico construed the order as a prohibition against alienation

-14-

and concluded that it had become effective as to the parties in interest at the moment that it was served upon them, notwithstanding the plaintiffs' failure to record it. Id. at 21-22. That order "effectively and firmly secured" the "effectiveness of any judgment" that thereafter might be entered in the plaintiffs' favor. Id. at 22.

The decision in Suarez v. Superior Court, 85 P.R.R. 522 (1962), is cut from the same cloth. There, the trial court granted the plaintiff's motion to freeze the defendant's bank account. Id. at 523-24. The plaintiff served the defendant with notice of the freeze order, but neither seized the account nor deposited the passbook into the registry of the court. Id. at 524. On certiorari review, the Supreme Court of Puerto Rico determined that the order was "of the nature of a prohibition to alienate" under Rule 56.4 and upheld it as against the defendant (who had actual notice). Id. at 529.

Freeman and Suarez share three salient similarities. In each case, the movant (the party procuring the prohibitory order) failed to comply with Rule 56.4's recordation or seizure requirements. Yet in each case, the movant timely apprised the complaining party of the court-imposed provisional remedy. And, finally, in each case the Supreme Court of Puerto Rico overlooked the lack of strict compliance with the requirements of Rule 56.4

because the complaining party had received actual notice of the prohibition in a timeous fashion.

Given these precedents, we decline to insist upon strict compliance here. As said, the underlying purpose of Rule 56.4's recordation and seizure requirements is to provide notice — and the present appellants plainly knew of the November 1995 orders well before they closed the transaction.[4] Consequently, there is no reason why the failure to record the prohibition against alienation should blunt the legal force of the court's orders vis-à-vis the appellants.

The appellants attempt to convince us otherwise by reference to a pair of Puerto Rico cases.[5] In the first such case,

_____

[4]In December 1995, Goya sent via certified mail copies of the November 1995 orders, accompanied by an explanation of the legal context surrounding them, to 625 Park and Wallack Management. While no such mailing was directed to Rennert — Goya did not know of his existence until well after he had acquired the Apartment — Rennert has acknowledged that he too received copies of the orders "sometime in 1995 or early 1996." To cinch matters, the district court found that each of the appellants received timely notice of its 1997 decision holding that Charles was the beneficial owner of the cooperative shares (and, thus, of the Apartment), Goya Foods, Inc. v. Unanue-Casal, 982 F. Supp. at 111-12, and the appellants do not challenge this finding. Thus, each of the appellants had actual notice of the November 1995 orders and of their relationship to the Apartment and the cooperative shares.

[5]The appellants also cite two bankruptcy court decisions. See Quadrel Leasing de P.R., Inc. v. Carlos A. Rivera, Inc. (In re Carlos A. Rivera, Inc.), 130 B.R. 377, 381-82 (Bankr. D.P.R. 1991); FDIC v. Debtor & Trustee (In re Moscoso Villaronga), 111 B.R. 13, 16 (Bankr. D.P.R. 1989). Neither case adds anything to the equation, and we decline to accord particular significance to these decisions. See Blinzler v. Marriott Int'l, Inc., 81 F.3d 1148, 1151 (1st Cir. 1996) (explaining that a federal court applying

Stargus Properties v. Superior Court, 101 P.R.R. 139 (1973), the trial court entered a standstill order effectuating "the prohibition to dispose of, or any condemnation proceeding over the property object of this litigation." Id. at 143. The defendants nonetheless sold a particular piece of property arguably affected by the order. Even though the defendants claimed not to have known about the standstill order and the plaintiff could provide no proof of service, the trial court found them in contempt. Id. at 144.

The Puerto Rico Supreme Court vacated the finding, concluding that the standstill order had not been "entered or processed according to the provisions of Rule 56 of the Rules of Civil Procedure." Id. at 146. In so holding, the court enumerated the order's myriad defects, including the fact that it had been issued sua sponte; that it completely failed to describe any specific properties; that the plaintiffs had neglected to record the order in the Registry of Property; and that, in all events, the plaintiffs had not posted a proper bond. Id. at 146-47. These combined infirmities were so severe that it is difficult, if not impossible, to argue that the court attached decretory significance to the failure to record, standing alone. We conclude, therefore, that Stargus is sui generis, and that the decision does not stand for the broad proposition that the Puerto Rico Supreme Court always

state law must heed the "rules of substantive law enunciated by the state's highest judicial authority").

-17-

insists upon strict compliance with the recordation and seizure requirements of Rule 56.4.

The appellants' second case, Cooperativa Central v. Flores, 68 P.R.R. 672 (1948), involved an attachment of commercial goods owned by a merchant defendant. Pursuant to the trial court's order, a marshal inventoried the goods in the defendant's shop and designated a depository. Id. at 673. The court subsequently ordered the goods sold at public auction. Id. at 673-74. The Supreme Court of Puerto Rico halted the sale and voided the attachment on the ground that the goods were not in custodia legis (and, therefore, not properly seized) because the marshal lacked the authority to designate a depository. Id. at 675-76. Whatever Flores may teach as to how attachments of fungible goods must be handled — a matter on which we take no view — we do not read the decision as mandating, without exception, strict compliance with Rule 56.4. Indeed, it seems safe to conclude that the Puerto Rico Supreme Court's subsequent decision in Suarez, plainly relaxing Rule 56.4's technical seizure requirements, 85 P.R.R. at 529, trumps the appellants' proposed reading of Flores.

To sum up, Stargus and Flores cannot bear the weight that the appellants pile upon them. The case law teaches that strict compliance with the recordation and seizure requirements of Rule 56.4 is not essential in every case. Nor do we discern any other colorable argument supporting the appellants' position that the

-18-

provisional remedies expired upon the district court's entry of judgment. While interlocutory orders sometimes may merge into a judgment, e.g., John's Insulation, Inc. v. L. Addison & Assocs., Inc., 156 F.3d 101, 105 (1st Cir. 1998), it is unreasonable to assume that any such merger occurred here. After all, timely appeals ensued, and the district court specifically stayed the execution of the judgment pending the completion of those appeals.[6] Goya Foods, Inc. v. Unanue-Casal, 982 F. Supp at 112. In a practical sense, the judgment rendered by the district court was not final until "the availability of appeal [was] exhausted." Griffith v. Kentucky, 479 U.S. 314, 321 n.6 (1987).

That ends this aspect of the matter. We reject the appellants' call for a mechanical construction of Rule 56.4 in favor of a flexible construction that recognizes the practicalities and the equities of individual situations. Following that path, we hold that a failure to comply with the recordation and/or seizure requirements of Rule 56.4, without more, does not render a court order containing a prohibition against alienation invalid as to a third party with actual notice of the terms of that restraint. Given the idiosyncratic circumstances of this case — especially the

---

[6]This stay comported with the practice in the commonwealth courts. See 32 P.R. Laws Ann. app. III, R. 53.9 (stipulating that the judgment of a Puerto Rico court is automatically stayed once it is appealed). Given this fact, it seems reasonable to assume that the Puerto Rico legislature did not intend provisional remedies issued under Rule 56.4 to expire automatically upon the entry of judgment in the trial court.

appellants' patent knowledge of the November 1995 orders and Goya's lack of a well-defined route for fulfilling Rule 56.4's recordation and seizure requirements[7] — we conclude that, even after the entry of judgment, the November 1995 orders continued to safeguard Goya's contingent interest in Charles's assets as to persons having actual knowledge of those orders, and that the Apartment and the cooperative shares remained subject to those orders when the appellants participated in the June 1998 transaction.

## III.  CIVIL CONTEMPT

We next address whether the district court's findings of civil contempt were properly grounded.  This assessment employs multiple standards of review.  We scrutinize the lower court's factfinding for clear error.  Project B.A.S.I.C. v. Kemp, 947 F.2d 11, 15 (1st Cir. 1991).  Withal, we evaluate its ultimate finding on contempt for abuse of discretion, approaching that inquiry

---

[7]The Apartment was located in New York City, so Goya was unable to file a cautionary notice in the Puerto Rico Registry of Property; and Goya likely was precluded from recording such a notice in New York's real estate records because New York law considers shares in a cooperative apartment to be personal property. See In re Estate of Carmer, 530 N.Y.S.2d 88, 89 (N.Y. 1988).  It is equally problematic whether the shares could have been physically seized, or whether Goya, without Liliane's cooperation, could have perfected a UCC-9 filing in New York. See N.Y. U.C.C. § 9-203(1)(a) (1998).  After all, Liliane not only fled the country but also defied other court orders to deposit assets in the registry of the court (e.g., the Emperor Equities shares). Whatever the answers to these questions, the absence of a straightforward methodology for satisfying the recordation and seizure requirements of Rule 56.4 represents an additional consideration that militates in favor of relaxing those requirements here.

"flexibly, with due regard for the circumstances." Langton v. Johnston, 928 F.2d 1206, 1220 (1st Cir. 1991). In performing that tamisage, we remain mindful that an error of law is the functional equivalent of an abuse of discretion. In re Grand Jury Subpoena, 138 F.3d 442, 444 (1st Cir. 1998).

The fact that the appellants were not parties to Goya's suit against the Unanues does not inoculate them against charges of civil contempt. Nonparties may be liable for civil contempt notwithstanding their nonparty status. See Microsystems Software, Inc. v. Scandinavia Online AB, 226 F.3d 35, 43 (1st Cir. 2000); G. & C. Merriam Co. v. Webster Dictionary Co., 639 F.2d 29, 34-35 (1st Cir. 1980). The critical datum is whether the nonparty "was in active concert or participation with the party specifically enjoined." Microsystems, 226 F.3d at 43. To satisfy that criterion, "the nonparty must be legally identified with that defendant, or, at least, deemed to have aided and abetted that defendant in the enjoined conduct." Id.

Here, the district court rested its contempt finding upon an "aiding and abetting" theory. The legal underpinning of such a theory is impeccable: it has long been recognized that a nonparty may be held in civil contempt if, and to the extent that, he knowingly aids or abets an enjoined party in transgressing a court order. See, e.g., Gemco Latinoamérica, Inc. v. Seiko Time Corp., 61 F.3d 94, 98 (1st Cir. 1995). The question, then, reduces to

-21-

whether the district court's deployment of the theory finds sufficient footing in the record.

There are two elements essential to invocation of this theory. The first is state of mind: a nonparty must know of the judicial decree, and nonetheless act in defiance of it. The second is legal identification: the challenged action must be taken for the benefit of, or to assist, a party subject to the decree. Here, both elements are foregone conclusions.

It cannot be gainsaid that each of the appellants had actual knowledge of the November 1995 orders. See supra note 4. This constitutes a solid foundation for the district court's finding that the appellants possessed the requisite state of mind to trigger civil contempt liability.

The appellants attempt to confess and avoid. They admit knowledge of the November 1995 orders, but asseverate that they lacked the requisite state of mind because they honestly believed that those orders had lapsed. This asseveration is unpersuasive.

When a legitimate question exists as to the scope or effectiveness of a court's order, those who know of the decree, yet act unilaterally, assume the risk of mistaken judgments. See Infusaid Corp. v. Intermedics Infusaid, Inc., 756 F.2d 1, 2 (1st Cir. 1985) (emphasizing that a party who harbors "doubt about the lawfulness of a proposed course of action" always can "ask the district court for guidance"). Adhering to this principle, the

appellants could have asked the district court for clarification as to the enduring vitality of the November 1995 orders, but they eschewed that course. They chose instead to rely on their own judgment as to whether the orders remained in effect. In so doing, the appellants acted at their peril. See McComb v. Jacksonville Paper Co., 336 U.S. 187, 192 (1949).

The identification element is similarly open-and-shut. Liliane Unanue was a party to the underlying action and, thus, a person subject to the November 1995 orders. The record here permits no reasonable conclusion but that the appellants aided and abetted Liliane's violation of those orders. After all, each of the three appellants played an essential role in consummating the forbidden transaction. Wallack Management offered the Apartment for sale, located a purchaser, and shepherded the transaction to its climax. 625 Park facilitated the sale by placing its imprimatur on the transfer of the Apartment and the cooperative shares. Rennert purchased the Apartment and the shares from Liliane, and executed an indemnity agreement in order to induce others to approve the transaction. In view of these actions, we must uphold the district court's finding that each of the appellants knowingly aided and abetted a party's (Liliane Unanue's) defiance of the November 1995 orders.

Given the foregoing, the conclusion seems inescapable that the appellants are susceptible to liability for civil

contempt.  The appellants nonetheless attempt to refute this conclusion, protesting that they acted throughout in good faith. The district court gave this protestation short shrift, and so do we.

The law is firmly established in this circuit that good faith is not a defense to civil contempt.  Star Fin. Servs., Inc. v. AASTAR Mortgage Corp., 89 F.3d 5, 13 (1st Cir. 1996); accord McComb, 336 U.S. at 191 ("An act does not cease to be a violation of a law and of a decree merely because it may have been done innocently.").  The appellants fail to advance any sound reason why this rule should not apply to nonparties.  For our part, we perceive no principled basis for allowing nonparties (but not parties) to invoke a good-faith defense.  We hold, therefore, that nonparties are not entitled to raise a good-faith defense in a civil contempt proceeding.

In a related vein, the appellants note that a contempt finding will not lie unless the putative contemnor violates a court order that is clear and unambiguous.  Kemp, 947 F.2d at 16. Starting from this premise, the appellants contend that the uncertainty surrounding the effectiveness of the November 1995 orders prevents Goya from fulfilling this requirement.  Their contention is wide of the mark.

The test is whether the putative contemnor is "able to ascertain from the four corners of the order precisely what acts

are forbidden." <u>Gilday</u> v. <u>Dubois</u>, 124 F.3d 277, 282 (1st Cir. 1997) (citation omitted).  Focusing the test within the four corners of a document limits the inquiry to an examination of that document's text.  <u>E.g.</u>, <u>United States</u> v. <u>Anderson</u>, 921 F.2d 335, 337-38 (1st Cir. 1990).  Thus, the "clear and unambiguous" standard applies to the <u>language</u> of the relevant court order, not to its effectiveness.  <u>See</u> <u>Star Fin. Servs.</u>, 89 F.3d at 13 (concentrating on the "unequivocal language" of the relevant order).  This is as it should be.  Were we to honor the appellants' thesis — that cobbling together a plausible legal argument about the effectiveness of an order renders the order unclear or ambiguous for contempt purposes — we would contradict our precedents emphasizing that the "clear and unambiguous" inquiry is limited to the four corners of the order itself.  Consequently, we reject the appellants' attempt to widen the lens of this inquiry to include uncertainties about the legal efficacy of the November 1995 orders (apart from those that might be inherent in the language of the orders).

Turning to the language of the orders, it is difficult to imagine how the November 1995 orders could have been worded in a clearer, more unambiguous way.  Those ukases plainly forbade not only the Unanues but also "their agents, employees, and all persons . . . acting in concert with them" from "alienating or in any way assigning, transferring, selling, or otherwise disposing or

encumbering [the Apartment,] including [the] cooperative shares [associated therewith]." This language leaves no room for doubt as to what the court intended.

The last piece of the puzzle is the requirement that the moving party establish by clear and convincing evidence that the putative contemnor violated the relevant court order. Kemp, 947 F.2d at 16; Langton, 928 F.2d at 1220. Here, the appellants left behind an extensive paper trail memorializing the events leading up to the transfer of the Apartment and the shares, and that documentary array constitutes overwhelming proof that they knowingly participated in a transaction expressly prohibited by the November 1995 orders.

The appellants do not seriously question this conclusion, but, rather, insist that the lower court was obliged to hold an evidentiary hearing before it could find, by clear and convincing evidence, that the appellants had abridged the November 1995 orders. This insistence is misplaced. In conjunction with the show-cause order, Goya introduced documentary evidence that established what the appellants knew, when they knew it, and the nature of the various actions that they took.[8] The appellants

_____

[8]The evidence showing that the appellants chose to participate in bringing about the transfer of the Apartment and the cooperative shares despite their actual knowledge of the ukases prohibiting that very eventuality included a memorandum written by Wallack Management's chief executive officer in March 1998 indicating his awareness that an operative restraint "presently" prohibited Liliane Unanue from selling the Apartment; 625 Park's steadfast

-26-

failed to contradict this evidence. The record, therefore, disclosed no genuine issue of material fact as to the appellants' roles. Given that void, an evidentiary hearing would have been a waste of time. See Morales-Feliciano v. Parole Bd., 887 F.2d 1, 6-7 (1st Cir. 1989) (explaining that a party has a right to an evidentiary hearing in a civil contempt proceeding only if, and to the extent that, genuine issues of material fact exist).

That ends our discussion of the liability issue. For the reasons elucidated above, we conclude that the district court did not abuse its discretion in finding the appellants in civil contempt.

## IV. CONTEMPT SANCTIONS

The court below initiated the civil contempt proceeding under its inherent power. See Shillitani v. United States, 384 U.S. 364, 370 (1966). Its authority to assess a sanction for contempt derives from the same source. Roadway Express, Inc. v. Piper, 447 U.S. 752, 764 (1980). A trial court has wide discretion in its choice of sanctions. Ray v. Eyster (In re Orthopedic "Bone Screw" Prods. Liab. Litig.), 132 F.3d 152, 156 (3d Cir. 1997). Once the trial court has chosen a particular sanction, appellate review is for abuse of discretion. EEOC v. Local 28 of Sheet Metal

_____

refusal to consummate the sale unless and until Rennert agreed to indemnify it against potential liability; and the confidentiality clause through which Liliane and the appellants attempted to sweep the entire transaction under the rug.

Workers Int'l Ass'n, 247 F.3d 333, 336 (2d Cir. 2001); R.I. Hosp. Trust Nat'l Bank v. Howard Communications Corp., 980 F.2d 823, 829 (1st Cir. 1992). When money is the sanction of choice, the abuse of discretion standard pertains not only to the trial court's selection of the sanction but also to its quantification of the award. Rolex Watch U.S.A., Inc. v. Crowley, 74 F.3d 716, 721 (6th Cir. 1996); Eck v. Dodge Chem. Co. (In re Power Recovery Sys., Inc.), 950 F.2d 798, 802-03 (1st Cir. 1991).

Federal courts are empowered to issue civil contempt sanctions to "protect[] the due and orderly administration of justice and . . . maintain[] the authority and dignity of the court." Roadway Express, 447 U.S. at 764. In a civil contempt proceeding, a monetary sanction, assessed for the purpose of compensating the complainant for losses sustained by reason of the contemnor's acts, is within the universe of permissible sanctions. See United States v. United Mine Workers, 330 U.S. 258, 303-04 (1947). Thus, make-whole relief is a commonplace sanction for civil contempt. So too are normal embellishments such as attorneys' fees and costs. G. & C. Merriam, 639 F.2d at 41.

The amount of an award of make-whole relief, like the amount of any monetary sanction that is remedial in nature, cannot be plucked out of thin air. The amount of such a sanction must be established by competent evidence, and must bear a reasonable

relationship to the actual losses sustained by the injured party. United Mine Workers, 330 U.S. at 304.

In this case, the lower court crafted a sanction with the evident purpose of compensating the complainant for losses sustained in consequence of the contemnors' violation of the November 1995 court orders. To be specific, the court assessed a compensatory sanction in the amount of $4,600,000 (the price paid for the Apartment), and then tacked on roughly $1,400,000 in prejudgment interest. As we explain below, the peculiar path that the court took in arriving at the latter figure needlessly complicated the matter.

We take first things first. The appellants' argument that the base amount assessed was inherently speculative, or grossly excessive, or both, is without merit. We rejected a similar argument in Gemco Latinoamérica, a case in which a nonparty bank had helped to arrange payments that violated an outstanding attachment. 61 F.3d at 98. The district court held the bank in civil contempt and imposed a sanction in the form of money damages. Id. We affirmed both the court's choice of a monetary sanction and its use of the funds that had been diverted as a measure of the amount. Id. at 98-100. In reaching this result, we explained that the bank's facilitative role made it "responsible for the full effect" of the dissipated funds. Id. at 100. That precedent is instructive here.

-29-

Goya held a valid judgment against Charles Unanue, and the district court had determined, in a decision since affirmed by this court, that the judgment could be partially enforced by levying against the Apartment and the cooperative shares. Goya's opportunity to execute against those assets was frustrated by the surreptitious sale and the subsequent transfer of the lion's share of the proceeds to a Swiss bank account. The appellants each played a facilitative role in consummating that forbidden transaction. Under the circumstances, the value of the vanished assets, as reflected by the purchase price actually paid in the contumacious transaction, strikes us as an equitable yardstick for measuring Goya's loss. See id. at 98, 100 (calculating damages for contemnor's illegal seizure of store's inventory based upon purchase price offered by a willing buyer); cf. Engine Specialties, Inc. v. Bombardier Ltd., 605 F.2d 1, 20 (1st Cir. 1979) (basing monetary contempt sanction upon contemnor's actual sales). We hold, therefore, that the district court acted well within the realm of its discretion in awarding Goya the base sum of $4,600,000.

This leaves the question of prejudgment interest. If the purpose of remedial contempt sanctions is to make an aggrieved party whole, then it follows that a court should be able to fashion sanctions that take into account not only the actual loss stemming from the contumacious conduct but also the time value of any

associated deprivation of funds. Accordingly, we hold that prejudgment interest, as a theoretical matter, is an acceptable component of a remedial sanction for civil contempt. See generally McComb, 336 U.S. at 193 ("The measure of the court's power in civil contempt proceedings is determined by the requirements of full remedial relief.").

Despite this holding, the award of prejudgment interest, as rendered in the case at bar, is problematic. The court opted to apply Puerto Rico's prejudgment interest rule, 32 P.R. Laws Ann. app. III, R. 44.3(b), lock, stock, and barrel to determine whether prejudgment interest should be granted, and if so, in what amount. In charting this course, the court seems to have lost sight of the fact that it was operating under the aegis of its inherent power, and instead approached the sanctions issue as if it were issuing an award of damages in, say, a tort action.

The genesis of this decision is not clear. We note, however, that the original action was brought by Goya under the court's diversity jurisdiction. See 28 U.S.C. § 1332(a). We think it likely, therefore, that the district court relied upon precedents teaching that, in diversity cases, state law determines "whether and how much pre-judgment interest should be awarded." Fratus v. Republic W. Ins. Co., 147 F.3d 25, 30 (1st Cir. 1998); see also Comm'l Union Ins. Co. v. Walbrook Ins. Co., 41 F.3d 764, 774 (1st Cir. 1994) (stating that a federal court sitting in

diversity jurisdiction ordinarily should apply the law that a local court sitting in the forum state would deem controlling in respect to prejudgment interest).

The difficulty is that the Fratus rule is inapposite here. Given that the district court convened the contempt proceeding under its inherent power, the court was free to award prejudgment interest as part and parcel of the contempt sanction, or to decline to do so, as a matter of federal law. The Puerto Rico rule simply was not controlling.[9]

The beacon by which we must steer is the Supreme Court's decision in Chambers v. NASCO, Inc., 501 U.S. 32 (1991). There, the district court, sitting in diversity jurisdiction, invoked its inherent power and assessed attorneys' fees as a sanction for bad-faith conduct during the litigation. Id. at 40-42. Before the Supreme Court, the sanctioned party contended that the trial judge was not free to order the payment of attorneys' fees as a sanction for bad-faith conduct unless applicable state law recognized such a praxis. The Court rejected this contention, explaining that since the trial judge based the fee award on the sanctioned party's

---

[9]Of course, the federal court, had it desired to make an interest award, could have drawn upon any reasonable statutory benchmark (state or federal) to set an appropriate rate. See Cottrill v. Sparrow, Johnson & Ursillo, Inc., 100 F.3d 220, 224-25 (1st Cir. 1996) (observing that courts fashioning awards under ERISA may use either state or federal rates in computing discretionary awards of prejudgment interest). But, this was not what the district court did.

conduct during the course of the litigation, the use of federal law as the source of authority for the award did not contravene the Erie principle. Id. at 51-53 (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938)). Extrapolating from Chambers, we hold that when a federal district court sits in diversity jurisdiction, its inherent power to impose monetary sanctions for contumacious conduct during the course of litigation is not circumscribed by the forum state's law regarding the imposition of sanctions. Accord People by Abrams v. Terry, 45 F.3d 17, 23-24 (2d Cir. 1995). We see no reason why this principle should not apply ex proprio vigore to prejudgment interest when such an award is imposed as part of a civil contempt sanction in a federal district court.

Based on the foregoing, we decline the parties' joint invitation to confront the difficult, nuanced question of whether the facts of record here bring this case within the confines of Rule 44.3(b). Rather, we strike the district court's award of prejudgment interest under that rule. But we do not stop there. Although the district court employed the wrong vehicle en route to an award of prejudgment interest, it plainly intended to afford make-whole relief by taking into account, to some extent, the time value of money. Under the circumstances, and in fairness to the parties, we think that the court is entitled to reconsider the question of remedies in light of our holding.

We view the district court's options as broad.  On the one hand, it may decide to leave well enough alone ($4,600,000 is, after all, a substantial amount of money).  On the other hand, it may decide that the equities counsel in favor of some increase in the base award to compensate Goya for the time value of the vanished purchase price.  The parties have not briefed these issues, and we believe that it should be open to them and to the lower court, on remand, to explore such potential modifications to the judgment.  E.g., FDIC v. Consol. Mortgage & Fin. Corp., 805 F.2d 14, 21 (1st Cir. 1986) (remanding issue neither briefed nor argued on appeal for further consideration).

## V.  CONCLUSION

We need go no further.  For the reasons stated, we affirm the judgment in part, vacate it in part, and remand for further proceedings consistent with this opinion.  As to those anticipated proceedings, we intimate no view of either the propriety or the wisdom of any particular outcome.

**Affirmed in part, vacated in part, and remanded**.  **Two-thirds costs are taxed in favor of the appellee**.